## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Bepex International, LLC, | Case No. 19-cv-2997 (KMM/JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| Hosokawa Micron BV, | |
| Defendant. | |

This case involves two companies that design and manufacture custom equipment for industrial machines.  At one point, the two entities were part of the same company, and for decades, the parties operated amicably under a license agreement that allowed them to share proprietary information to coordinate sales.  Unfortunately, their relationship eventually took a turn for the worse.  After the plaintiff terminated the license agreement, it alleges that the defendant unlawfully continued to use its trade secrets to sell equipment.

Plaintiff Bepex International, LLC sued Defendant Hosokawa Micron BV ("HMBV") for breach of contract and theft of trade secrets under state and federal law.   For the reasons described below, the Court grants in part and denies in part HMBV's Motion for Summary Judgment [Dkt. No. 261]; affirms Judge Docherty's Order [Dkt. No. 368] dated September 19, 2022 granting in part and denying in part HMBV's First Motion to Strike; overrules Bepex's Objections to that Order [Dkt. No. 375]; and denies HMBV's Second Motion to Strike [Dkt. No. 339].

## I.   BACKGROUND

### A.  Longstanding Business Relationship

Bepex is a privately-owned, limited liability company in Minnesota that designs and manufactures custom industrial processing equipment.  [Compl. ¶¶ 2, 7, Dkt. No. 1.]  HMBV, headquartered in the Netherlands, also designs and manufactures this type of equipment.  [HMBV Mem. Summ. J. 3, Dkt. No. 263.]  From 1992 to 2004, both companies were owned by the same parent company, Hosokawa Micron Group, and they entered into a license agreement that permitted HMBV to use Bepex's proprietary information to manufacture and sell Bepex products in certain European countries.  [*Id.* at 4–5; *see also* Dkt. No. 1-A (hereinafter "2016 License Agreement").]   Bepex sent physical binders containing this proprietary information to HMBV between 1992–1995 and trained HMBV employees in Minnesota and in Europe on how to design and manufacture Bepex equipment.  [HMBV Mem. Summ. J. 5; Bepex Opp'n 4, Dkt. No. 323.]  After Bepex repurchased its assets in 2004 and was no longer owned by Hosokawa Micron Group, the parties continued to work together, renewing their license agreements on several occasions.  [Compl. ¶ 8.]  Their last license agreement began on September 2, 2016 and expired on September 2, 2019.  [*Id.* ¶ 9.]

Relevant to this litigation, the 2016 License Agreement allowed HMBV to sell three types of Bepex machines: (1) the Turbulizer, which is a rotating mixer that mixes powders, solids, and liquids; (2) the TorusDisc, which is a heating and drying device; and (3) the Solidaire, which is an indirect drying device.  [Bepex Opp'n 2.]  The 2016 License Agreement provided for automatic renewal after a three-year term, but it allowed either side to terminate the agreement with a six-month notice.  [HMBV Mem. Summ. J. 8.]  The agreement stated

that termination did not end the parties' confidentiality obligations.  [HMBV Mem. Summ. J. 8.]

Bepex contends that HMBV was a "poor licensee" because it sold only one piece of equipment under the 2016 License Agreement and it was slow to pay royalties.  [Bepex Opp'n 5.]  Bepex emailed HMBV on November 30, 2018 to communicate that it did not intend to renew the license agreement.  [Bepex Opp'n 5.]  Bepex then sent HMBV a formal written notice of termination on January 4, 2019 declaring that it would terminate the agreement upon its expiration on September 2, 2019.  [Compl. ¶ 10.]  The parties attempted to negotiate a termination agreement, but those negotiations failed.  [Compl. ¶ 11.]

### B. Disputed Sales

Three sales HMBV made to third parties, and their timing, are at the heart of this litigation.  With respect to two of these sales, HMBV received and accepted the order while the 2016 License Agreement was in effect but delivered the equipment after the termination date of the agreement.  Bepex claims that HMBV breached the license agreement by continuing to use its confidential information in these sales after the agreement ended.  The parties dispute whether these sales should be counted at the time the orders were accepted, which was within the licensing agreement period, or at the time the equipment was delivered.

The third sale at issue was both ordered and delivered after the 2016 License Agreement was terminated.  For this sale, the parties dispute whether HMBV independently designed the equipment or used information it gleaned from Bepex over their prior relationship.  For all three transactions, Bepex claims that HMBV unlawfully used Bepex's

confidential trade secrets, subjecting HMBV to liability for misappropriation of trade secrets under state and federal law.

The first transaction was HMBV's sale of a ███████ to ███████ in ███. Bepex claims that it had a longstanding relationship with ███████, having sold them ███████ since the 1970s. [Bepex Opp'n 6.] Bepex contends that ███████ approached it about buying ███████ for its operations in Europe. [*Id.*] Bepex and HMBV shared fabrication drawings and bills of materials for these sales. [*Id.*] On December 14, 2018—before the 2016 License Agreement expired in September 2019—HMBV entered into a sales agreement with ███████ ███████████████████████████. [Dkt. No. 295 (hereinafter ███████ Sales Agreement").] The agreement was for the purchase of a ███████ to be delivered to ███████ facilities in ███ in March 2020. [*Id.*] The purchase order specified that HMBV would be paid in installments, with 40% to be paid within 60 days of the purchase order date, 30% to be paid within 60 days of approval of the final design package, and 30% to be paid within 60 days of delivery. [*Id.* at 3.] A written purchase order dated December 18, 2018 confirmed the request for the ███████. [Dkt. No. 331-1 (hereinafter ███████ Purchase Order").]

Second, HMBV sold ███████ to ███████ in ███████. ███████ sent two purchase orders to HMBV on December 6, 2018—again, before the 2016 License Agreement between HMBV and Bepex expired in September 2019. [Dkt. No. 293 (hereinafter ███████ Purchase Orders.")] Those purchase orders specified that ███████ would pay 30% at the time of order, 30% when the drawings were approved, 30% after a successful factory acceptance test, and the remaining 10% at delivery. [*Id.* at 4.] HMBV confirmed both orders in writing on December 13, 2018. [Dkt. No. 294 (hereinafter "███████ Sales Contracts").] The sales

contracts required HMBV to deliver the equipment to facilities in ██████ in November and December 2019.  [*Id.*; HMBV Mem. Summ. J. 9]

The third sale involves HMBV selling a disc cooler vacuum to ██████ in ██████. HMBV maintains that "around the same time" it entered into sales contracts with ██████ and ██████, it received an inquiry from ██████ about manufacturing a disc cooler vacuum. [HMBV Mem. Summ. J. 9–10; Dkt. 167-1 at 4.]  HMBV and ██████ signed a sales contract on September 29, 2019—after the 2016 License Agreement expired on September 2, 2019. [Dkt. No 327-20 (hereinafter "HMBV Sales Chart").]  HMBV claims it started developing its own disc cooler vacuum on January 4, 2019 based on "public domain information and its own knowledge." [HMBV Mem. Summ. J. 9–10; Dkt. 167-1 at 4.]  Bepex disputes that HMBV independently developed its own disc cooler vacuum and contends that HMBV used Bepex's trade secrets to complete this order.  [Bepex Opp'n 7–9.]  HMBV delivered the equipment to ██████ in ██████ in April 2021.  [HMBV Sales Chart.]

### C.  Motion for Summary Judgment

After talks concerning a possible termination agreement broke down, Bepex sued HMBV for breach of contract and theft of trade secrets in November 2019, seeking monetary, declaratory, and injunctive relief.  [*See generally* Compl.]  HMBV filed a motion for summary judgment in June 2022, and the Court heard arguments on that motion in September 2022. HMBV argues that Bepex's state and federal law claims for trade secret misappropriation fail as a matter of law because Bepex has not specifically identified its trade secrets, Bepex cannot show misappropriation, and Bepex cannot establish that HMBV took acts in furtherance of alleged misappropriation in the United States.  [HMBV Mem. Summ. J. 17–32.]  As for Bepex's

breach-of-contract claims, HMBV argues that these claims fail as a matter of law because it entered into sales agreements with ██████ and ██████ while the 2016 License Agreement with Bepex was still in effect. [*Id.* at 32–36.]  HMBV also contends that Bepex's theories for damages based on unjust enrichment and lost profits are speculative and must be dismissed. [*Id.* at 36–43.]

In response, Bepex contends that it sufficiently identified five categories of trade secrets, established that misappropriation occurred, and identified acts in furtherance of the misappropriation that took place in the United States.  [Bepex Opp'n 1–34.]  And because there is evidence that HMBV delivered the equipment to ██████ and ██████ after the license agreement was terminated, Bepex argues that its breach-of-contract claims should not be subject to summary judgment.  [*Id.* at 34.]  Regarding its request for money damages, Bepex responds that HMBV's arguments are unfounded.  [*Id.* at 39–43.]

### D. First Motion to Strike

In May 2022, HMBV filed its first motion to strike, seeking to strike Bepex's Third Supplemental Answers to HMBV's Interrogatories as untimely.  [First Mot. to Strike, Dkt. No. 215.]  Bepex opposed, arguing that the District of Minnesota does not allow motions to strike discovery responses, that HMBV failed to meet and confer on underlying issues, and that its Third Supplement was timely.  [Bepex Opp'n First Mot. to Strike, Dkt. No. 232.]

On September 19, 2022, a few days before the Court held a hearing on HMBV's Motion for Summary Judgment, Judge Docherty issued an order granting HMBV's motion in part and denying it in part.  Judge Docherty found that Bepex's disclosures regarding the identification of trade secrets, the circumstances of their transfer, and the lost profits damages

theory were timely, but precluded Bepex from "relying on its untimely disclosure of Mr. [Tom] Brion as an expert witness at trial" because the late disclosure was neither substantially justified nor harmless.  [Order on First Mot. to Strike 1, 22, Dkt. No. 368.]

Four days later, Bepex sought leave to file a motion to reconsider that order, arguing that Mr. Brion's trial testimony would not be expert testimony and that HMBV did not suffer prejudice from the late disclosure of Mr. Brion's identity, having taken his deposition and referenced it in HMBV's Motion for Summary Judgment.  [Letter, Dkt. No. 369.]  Bepex also filed Objections to his Order on October 3 containing similar arguments that HMBV was not prejudiced.  [Objections 1, Dkt. No. 375.]

On November 2, Judge Docherty denied Bepex's request for leave to file a motion for reconsideration, reasoning that his previous order was limited to precluding Bepex from calling Mr. Brion as an expert witness, and it "took no position on Bepex calling Mr. Brion as any other kind of witness."  [Order Denying Leave, Dkt. No. 391.]

### E.  Second Motion to Strike

After Bepex filed its brief in opposition to HMBV's Motion for Summary Judgment, HMBV filed a second motion to strike.  It filed this motion on the same day that it filed its reply brief supporting its motion for summary judgment.  [*See* Dkt. Nos. 339, 346.]  In the Second Motion to Strike, HMBV requested that this Court strike exhibits filed in support of, and arguments contained within, Bepex's opposition brief to HMBV's Motion for Summary Judgment.  More specifically, HMBV moved for an order striking identifications of trade secrets that allegedly were first identified in Bepex's brief; Exhibit 5 to Tom Brion's Declaration filed in support of the brief; Exhibit 55 to Jeffrey Post's Declaration in support

of the brief; and references in the brief to "non-produced documents relevant to [Bepex's] unjust enrichment claim." [HMBV Mem. Second Mot. to Strike 1, Dkt. No. 341.]

Bepex opposed the second motion to strike on three bases. First, it argued that the District of Minnesota does not allow motions to strike exhibits and arguments contained in summary judgment briefing. [Bepex Opp'n to Second Mot. to Strike 1, Dkt. No. 360.] Second, it argued that HMBV's Second Motion to Strike is essentially another summary judgment brief masquerading as a separate motion to evade the word limit. [*Id.*] Third, it argued on the merits that Bepex had access to the information at issue, and any alleged delay in disclosure was harmless. [*Id.* at 2.]

## II.   MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party.  *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Torgerson v. City of Rochester*, 643 F.3d 10131, 1042 (8th Cir. 2011) (en banc).

## B. Trade Secret Misappropriation

Bepex brought claims of trade secret theft under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and its state-law analog in Minnesota, the Uniform Trade Secrets Act, Minn. Stat. § 325C ("MUTSA").  To bring a claim under DTSA, a plaintiff must establish that they have a trade secret, that the trade secret was misappropriated, and that the trade secret was used in or intended for interstate or foreign commerce.  18 U.S.C. § 1836(b)(1).  DTSA contains an extraterritoriality provision that limits its application to foreign defendants.  A plaintiff cannot sue for trade secret misappropriation occurring outside the United States unless the defendant is a citizen of the United States, an entity organized under its laws, or if "an act in furtherance of the offense was committed in the United States."  18 U.S.C. § 1837.  Here, the parties agree that HMBV is neither a citizen of nor organized under the laws of the United States.  They disagree whether an act in furtherance of the alleged misappropriation occurred in the United States.

Congress enacted DTSA in 2016.  Because it is a relatively new statute, there are few cases applying its extraterritoriality provision—so few, in fact, that this Court has endeavored to read every single one.  With this persuasive authority in hand, this Court finds there is no

genuine dispute from which a reasonable jury could conclude that DTSA's extraterritoriality provision applies to Bepex's trade secret misappropriation claims in this case.[1]

DTSA defines "misappropriation," but it does not define an act "in furtherance of the offense." *See* 18 U.S.C. § 1839. Many courts have borrowed from federal conspiracy law, holding that an act in furtherance of misappropriation "must manifest that the offense is at work and is not simply a project in the minds of the offenders or a fully completed operation." *Luminati Networks Ltd. v. BIScience Inc.*, Civil Action No. 2:18-CV-00483-JRG, 2019 WL 2084426, at *10 (E.D. Tex. May 13, 2019) (cleaned up). In other words, "an act that occurs before the operation is underway or after it is fully completed" is not an act in furtherance of the misappropriation. *Id.* While the act in furtherance need not be the act of misappropriation itself, it must be connected to the misappropriation—unrelated actions by the defendant that happen to occur in the United States will not do. *See, e.g., ProV Int'l Inc. v. Lucca*, Case No. 8:19-cv-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (dismissing DTSA claim because there were "no facts connecting" the defendant's attendance at a trade show in the United States to the alleged misappropriation). None of the arguments Bepex puts forth for why DTSA's extraterritoriality provision reaches HMBV's conduct carries the day.

---

[1] The parties spilled considerable ink disputing whether Bepex sufficiently identified the trade secrets it claims HMBV misappropriated. The parties devoted less time to whether acts in furtherance of the alleged misappropriation occurred within the United States. Perhaps realizing this, Bepex sought leave from the Court after the motion hearing to file supplemental briefing on the issue of extraterritoriality. [Letter, Dkt. No. 382.] The Court granted the request and has carefully considered the supplemental briefs submitted by each party. As described in more detail below, nothing in the supplemental briefing changes the Court's conclusion that DTSA does not reach the alleged misappropriation in this case.

### 1.  Contractual Provisions

Bepex first insists that DTSA applies to HMBV because the two parties agreed in their license agreement to be "subject to the exclusive jurisdiction of the US courts located in Hennepin County, Minnesota" and agreed that the contract would be governed by "US Federal law and the laws of the State of Minnesota." [2016 License Agreement 9.]  Exclusive jurisdiction and choice-of-law provisions, however, do not allow parties to contract around the explicit limitations on a statute's extraterritorial reach.  Such contractual provisions merely select which bodies of law will be used to resolve a dispute, and in which courts a dispute can be brought.  They do not, and cannot, override a legislature's intent and make a specific statute apply to a situation the legislature did not intend that law to cover.  For instance, if Congress had decided that DTSA should only apply to conduct outside the United States that is committed by Chinese companies with fewer than 50 employees, a plaintiff could not claim that DTSA applies to misappropriation by a Swedish company with 500 employees simply because the parties agreed that United States law governs their disputes.

Courts in this district have repeatedly rejected arguments that choice-of-law provisions can rewrite the substantive terms and reach of a statute.  For instance, Chief Judge Schiltz rejected an out-of-state company's argument that it should enjoy the protections of the Minnesota Termination of Sales Representative Act—which does not apply to out-of-state companies—simply because its sales-representative agreement included a Minnesota choice-of-law provision.  *N. Coast Tech. Sales, Inc. v. Pentair Tech. Prods., Inc.*, No. 12-CV-1272 PJS/LIB, 2013 WL 785941, at *2 (D. Minn. Mar. 4, 2013).  He succinctly reasoned that a "choice-of-law clause *applies* Minnesota law; it does not *change* Minnesota law."  *Id.*  Similarly, Judge

Montgomery declined to apply the Minnesota Human Rights Act to an out-of-state employee even though his employment agreement had a Minnesota choice-of-law provision, holding that he lacked standing under the MHRA because he did not live or work in Minnesota. *Longaker v. Bos. Sci. Corp.*, 872 F. Supp. 2d 816, 817–20 (D. Minn. 2012).

A few years later, in *Buche v. Liventa Bioscience, Inc.*, 112 F. Supp. 3d 883, 888 (D. Minn. 2015), Chief Judge Schiltz rejected an out-of-state employee's argument that a Pennsylvania wage statute should apply because of a choice-of-law provision in his employment contract. Judge Schiltz emphasized that the Court "must apply Pennsylvania law according to its own terms." *Id.* In *Buche*, because the Pennsylvania Wage Payment and Collection Law did not provide a cause of action to out-of-state employees, "even if this dispute is governed by Pennsylvania law," the plaintiff "cannot recover" under that specific statute. *Id.*; *see also Rao v. St. Jude Med. S.C., Inc.*, Civ. No. 19-923 (MJD/BRT), 2020 U.S. Dist. LEXIS 128068, at *10, 14 (D. Minn. May 26, 2020) (rejecting argument that a choice-of-law provision can make the Minnesota Payment of Wages Act apply to an out-of-state employee, holding that a "party cannot contract around what the legislature has already proscribed"). HMBV's mere acquiescence in the 2016 License Agreement to the exclusive jurisdiction of this Court and to have federal and Minnesota law govern the contract does not mean that DTSA automatically

applies to HMBV's conduct abroad.[2]  Bepex must show something more than a choice-of-law or exclusive-jurisdiction provision to establish an act in furtherance of the offense.

### 2.  Acquisition and Origination of Trade Secrets

Bepex's next argument is that the trade secrets at issue in this case originated in the United States and as a result, HMBV's initial acquisition of them constitutes an act in furtherance of the offense that was committed in the United States.  Specifically, Bepex points to the physical binders of drawings it sent to HMBV from Minnesota in the early years of the relationship as well as in-person training it conducted for HMBV employees that occurred in Minnesota as qualifying acts.  Neither creates a triable issue.

Importantly, there is no evidence in this case of an intent or scheme to misappropriate the trade secrets at the time of their acquisition.  *See Luminati*, 2019 WL 2084426, at *10 (explaining that an act in furtherance "must manifest that the offense is at work and is not simply a project in the minds of the offenders") (cleaned up).  Instead, all of the trade secrets at issue were transferred and accepted as part of a years-long licensing agreement and business partnership.  In an effort to reframe this reality, Bepex alleges a "long-standing plan" and

---

[2] This Court is aware of the First Circuit's recent decision in *Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*, 48 F.4th 18 (1st Cir. 2022), holding that a forum-selection clause trumped DTSA's reach.  *Amyndas*, however, involved a meaningfully different factual situation from the one before this Court.  There, the contract required all claims to be brought in Denmark, but the plaintiff nevertheless argued that it should be able to bring suit in the United States because DTSA "guarantees a federal forum for trade secret theft claims."  *Id.* at 35.  The First Circuit rejected this argument, explaining that "the mere existence of the DTSA" does not preclude a court from enforcing the parties' choice for disputes to be filed elsewhere.  *Id.* Here, by contrast, the parties agree that disputes must be brought in the United States, and this Court is enforcing that choice.  While *Amyndas* stands for the relatively straightforward idea that parties can agree, as a matter of contract, to a forum other than in the United States, here, the operative question is whether a party who agrees to the application of a body of law has necessarily changed the scope of its application.

"ruse" on HMBV's behalf to "use the trade secrets after termination of the License Agreement and accrual of trade secrets for that purpose." [Bepex Suppl. Br. 2, Dkt. No. 392.] But even taking reasonable inferences in Bepex's favor, its record citations utterly fail to substantiate such speculation. Bepex points to a 2013 email in which HMBV stated that if the license agreement between them was not renewed, it would manufacture drying equipment "with partly similar technology as Bepex." [*Id.*] Bepex also selectively quotes from meeting minutes regarding the renewal of the 2013 license, which state in full: "If no compromise can be reached, both parties recognize *and Bepex allows* that HMBV intends to market continuous dryers in competition with Bepex although without the use of the trademarks owned by Bepex." [Dkt. No. 327-4 (emphasis added).] The record reflects that Bepex's chief executive signed and circulated those minutes, suggesting its approval. [*Id.*] Bepex makes the bold assertion that these two documents show that "HMBV indicated in 2013 that it would misappropriate Bepex's trade secrets." [Bepex Suppl. Br. 3–4.] Far from revealing such a scheme, this evidence instead reflects a general business desire to continue operations to the extent permitted by the terminated license agreement if the parties could not agree on an extension. It would strain credulity for a jury to infer from these documents that HMBV had a malicious, illicit intent given that Bepex chose to reenter a licensing agreement and continued sharing its trade secrets with HMBV for several more years.

Bepex also relies on a 2019 letter from HMBV's counsel in the United States as evidence of an alleged longstanding plan to misappropriate Bepex's trade secrets. In that letter, HMBV's counsel acknowledges HMBV's continuing confidentiality requirements pursuant to the terminated 2016 licensing agreement but contends that HMBV believes it may "rightfully

14

use . . . any technical information publicly disclosed in expired patents" or "any other publicly available technical information."  [Ex. B, Dkt. No. 1-2.]  This letter provides no evidence of intentional misappropriation.  It evinces an intent to "continue making and selling machines in the European market" based on publicly available information, expired patents, and HMBV's own "know-how," and it pushes back on Bepex's contention as overbroad that HMBV cannot make machines with a "similar fit, form, and function" to Bepex-branded machines.  [*Id.*]  No reasonable factfinder could view this letter as anything other than pre-litigation negotiation between parties; it certainly cannot be the basis on which to infer malicious intent years or decades earlier.

The facts and circumstances of this case stand in stark contrast to the authority Bepex relies upon, in which defendants acquired plaintiffs' trade secrets with the specific intent to misappropriate them later.  *See Medcenter Holdings Inc. v. WebMD Health Corp.*, No. 1:20-CV-00053 (ALC), 2021 WL 1178129, at *6 (S.D.N.Y. Mar. 29, 2021) (denying a motion to dismiss a DTSA claim where the complaint alleged sufficient facts to suggest that the defendant's negotiation of an agreement in the U.S. was a "Trojan Horse" to learn about the plaintiff's proprietary information); *MedImpact Healthcare Sys., Inc. v. IQVIA Inc.*, Case No.: 19cv1865-GPC(LL), 2020 WL 5064253, at *15 (S.D. Cal. Aug. 27, 2020) (identifying acts in furtherance of misappropriation alleged in the pleading sufficient to overcome motion to dismiss for failure to state a claim).  In *Medcenter*, the plaintiff sufficiently alleged that the defendant used confidential information it acquired under the guise of acquisition talks to poach the plaintiff's Vice President of Sales and convince her to amass, download, and steal the plaintiff's confidential data before resigning from the plaintiff and joining the defendant shortly after.

*Id.* at *2–4. In *MedImpact*, the defendants acquired an entity that was operating in a joint venture with the plaintiffs, made numerous misrepresentations to the plaintiffs to convince them to agree to that acquisition, accessed the plaintiffs' confidential data through the joint venture, and then swiftly stole the joint venture's customers for themselves and unilaterally terminated the joint venture after getting the information they needed. *See id.* at *1–5, *14–15. Moreover, whereas the parties accused of misappropriation in *Medcenter and MedImpact* terminated the relevant relationships, thereby permitting an inference of their malicious intent from the outset, Bepex chose to terminate the licensing agreement and partnership with HMBV, not the other way around. *See Medcenter*, 2020 WL 5064253 at *15; *MedImpact*, 2021 WL 1178129 at *2; Bepex Opp'n at 5 (describing Bepex's decision to terminate the agreement.)

In both cases, there were sufficient allegations to suggest a ploy to misappropriate trade secrets at the time of their initial acquisition, and the courts were applying the relatively permissive standard of Rule 12(b)(6). Here, an implication of nefarious intent through mere allegations is simply insufficient to carry Bepex's burden at the summary judgment stage. Although Bepex, as the nonmoving party, is entitled to all reasonable inferences, reasonable inferences are "those that can be drawn from the evidence without resort to speculation." *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)). Bepex has attempted to manufacture a factual dispute through speculation and implication, but it "must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Id.* (quoting *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018)). But a factfinder would have to engage in speculation to agree with

Bepex's interpretation of record evidence as revealing a longstanding scheme on the part of HMBV to continue its relationship with Bepex for the purpose of misappropriating confidential information later. At the time Bepex provided the trade secrets to HMBV, it was pursuant to a mutually beneficial relationship between the two companies that continued for nearly twenty years without evidence of misappropriation or malicious intent.

### 3. Acts by Bepex

Aside from contending that HMBV intended to steal Bepex's trade secrets all along, Bepex also suggests that DTSA should apply to this dispute because *Bepex* committed acts in furtherance of the misappropriation in the United States. For example, Bepex contends that it "contracted with HMBV in the U.S., and gave HMBV its trade secrets that were developed by U.S. employees." [Bepex Suppl. Br. 5.] The Court generally agrees that "acts in furtherance" of misappropriation need not be committed by the defendant for DTSA to apply. *See vPersonalize Inc. v. Magnetize Consultants Ltd.*, 437 F. Supp. 3d 860, 878–79 (W.D. Wash. 2020) (noting that the text of DTSA's extraterritoriality provision does not specify an actor). Accordingly, courts have applied DTSA to cases in which defendants acquired stolen trade secrets through a United States intermediary, *id.*, or disclosed trade secrets to a web developer in the United States, *Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, Civil Case No. 1:17-cv-00073-MR, 2021 WL 861712, at *17 (W.D.N.C. Mar. 8, 2021), because the acts of those third-parties furthered the misappropriation and occurred in the United States. However, this authority does not support extraterritorial application of DTSA here.

It is one thing to apply DTSA to actions of a third-party in the United States that is involved in the defendant's misappropriation. But Bepex asks the Court to go a step further

and hold that a *plaintiff's* actions can qualify as "acts in furtherance of the offense." The import of Bepex's argument is to render DTSA's extraterritoriality provision a nullity. Accepting such an argument would make the location of the plaintiff dispositive and mean that any time a foreign company engages with a United States company, it is automatically subject to DTSA's reach. The Court cannot interpret "an act in furtherance of the offense" as loosely as Bepex suggests in this case.

### 4. Failure to Return Trade Secrets

Bepex also alleges that HMBV's failure to return Bepex's trade secrets is a qualifying act in furtherance of the misappropriation. Interpreted literally, a failure to return something *to* the United States is not an act "committed in the United States." 18 U.S.C. § 1837(2). Moreover, the section of the 2016 License Agreement regarding termination of the contract is silent on returning physical materials. And perhaps most importantly, this does not appear to be a genuine dispute. Although Bepex alleges that HMBV kept its drawings, at the hearing it acknowledged a declaration in which HMBV's Managing Director swore under oath that HMBV returned Bepex's drawings. [Tr. of Sept. 27, 2022 Hr'g at 36–37, Dkt. No. 397.] Bepex suggests that HMBV held on to drawings HMBV made that were *based on* Bepex's drawings. [*Id.*] Even if Bepex relied on record evidence to support this allegation rather than resorting to speculation, this does not suffice to meet DTSA's extraterritoriality provision. Keeping drawings rendered in the Netherlands based on Bepex's original drawings is not an act "committed in the United States."

### 5. Royalty Payments to U.S. Bank Accounts

Bepex also contends that making royalty payments for the disputed sales in U.S. dollars from a U.S. bank account subjects HMBV to DTSA's reach. It is unclear from the briefing whether Bepex is suggesting that HMBV used an American bank account to send the royalty payments or that Bepex received the funds in an American bank account. In any event, Bepex cites no authority for the idea that paying in American currency is a sufficient act for DTSA's extraterritoriality provision. Even if using American currency or an American bank could shift the needle on extraterritoriality, here the royalty payments in question came after the alleged misappropriation, not before. For the same reason that courts have found revenue that plaintiffs lost in the United States as a *result* of defendants' misappropriation abroad cannot be "acts in furtherance," the royalty payments Bepex received in the United States for HMBV's sales abroad based upon allegedly misappropriated trade secrets are insufficient to meet DTSA's extraterritoriality provision. *Cf. Luminati*, 2019 WL 2084426 at *10; *ProV Int'l*, 2019 WL 5578800 at *3. Acts that occur after the alleged misappropriation is "fully completed" are not acts "in furtherance of" the offense. *Luminati*, 2019 WL 2084426 at *10.

### 6. Sales to Customers in the United States

Bepex asserts that two of HMBV's disputed sales were to companies based in the United States, and therefore selling equipment to those customers constituted acts in furtherance of the misappropriation that occurred in the United States. Indeed, a few courts have held that using someone else's trade secrets to sell or advertise products to customers in the United States can qualify as an act in furtherance of the misappropriation. *See, e.g.*, *vPersonalize Inc.*, 437 F. Supp. 3d at 879 (declining to dismiss DTSA claim where defendant

offered allegedly misappropriated products throughout the United States); *Hermann Int'l*, 2021 WL 861712 at *17 (same); *but see Sysco Mach. Corp. v. Cymtek Sols., Inc.*, Civil No. 22-11806-LTS, 2022 WL 17823769, at *1 (D. Mass. Dec. 20, 2022) (holding that the "ordinary understanding of 'use' of a trade secret as that term is used in the statute," does not "reach[] the sale of machines in the US" that were "created from the use of the trade secret in another country"). This Court need not decide whether using trade secrets to make products abroad but selling them to U.S. customers is sufficient under DTSA because Bepex failed to present evidence from which a reasonable jury could conclude that HMBV sold or advertised its products to U.S. customers.

Under the licensing agreement, HMBV was only permitted to make sales in the Netherlands and certain other countries listed in the agreement. [*See* 2016 License Agreement at 1 (defining exclusive territory as "The Netherlands" and non-exclusive territory as "the countries within Europe as listed on Schedule C")]. HMBV made no sales in the United States, either during the licensing agreement period or after. And there is no evidence that HMBV targeted U.S. customers like the defendants in *vPersonalize Inc.* and *Hermann International*.

Bepex nevertheless contends that ▮▮▮▮ and ▮▮▮▮ are U.S. based companies, and that fact alone is enough to make sales to them run afoul of DTSA. However, the sales agreements and purchase orders between HMBV and its customers establish otherwise. The ▮▮▮▮ purchase order specifies that the buyer is ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮," a ▮▮▮ company, and an invoice shows the delivery location as the ▮▮▮▮▮▮▮▮▮. ▮▮▮ Purchase Order at 2.] Likewise, the purchase order HMBV entered with ▮▮▮ identifies the buyer as ▮▮▮▮▮▮▮▮▮▮▮ with

the project location in ███████████ .  [*See* ███████ Purchase Order at 2, 8, Dkt. No. 329.]

This is not evidence of sales or advertising targeting U.S.-based purchasers.

Whether HMBV made sales to U.S. customers fails to be a genuine factual dispute.

The customers who signed the sales agreements with HMBV are not U.S. companies, and

none of the products HMBV sold to these customers ended up in the U.S. market.  That

HMBV's sales to companies abroad can be traced back to parent companies in the United

States is insufficient, on its own, to qualify as an act "committed in" the United States, when

the seller and delivery location are both located outside the United States.

### 7.  Legislative Intent

Finally, Bepex falls back on the legislative intent behind DTSA and emphasizes that

Congress was concerned with protecting American companies from theft of trade secrets by

international actors.  Bepex argues that if DTSA does not reach HMBV's conduct in this case,

such an interpretation contravenes the objective of the statute as evidenced by its legislative

history.  Bepex also suggests, without citation or support, that "the text and legislative intent"

of DTSA demonstrate that courts should give it a broader reach when long-term business

relationships are at issue.  [Bepex Suppl. Br. at 5.]

This all may be true.  *See, e.g.*, Pub L. 114-153, 130 Stat 376, 383-84 § 5 ("It is the sense

of Congress that . . . (1) trade secret theft occurs in the United States and around the world;

(2) trade secret theft, wherever it occurs, harms the companies that own the trade secrets and

the employees of the companies.").  But this Court's job is not to rewrite statutes for Congress

or point out a statute's shortcomings.  Even if Congress had a general intent to protect theft

of U.S. trade secrets through enacting DTSA, it chose to include an express extraterritoriality

provision precluding the statute's reach to foreign companies if "an act in furtherance of the offense" was not committed in the United States.  Congress chose the words to put in the statute, and in this case, it used very specific text to circumscribe DTSA's application to foreign defendants.  Congress has already balanced the relevant policy considerations and distilled them into the language of the Act, and this Court's job is to apply the plain meaning of those words as they appear in the text of the statute.  It is not this Court's job to modify statutory language based upon policy concerns, regardless of how well-founded those concerns may be.

### 8.  MUTSA

Because no "act in furtherance of the offense" was committed in the United States, there necessarily was no act in furtherance of the alleged misappropriation committed in Minnesota.   There is a general presumption that Minnesota statutes don't apply extraterritorially, and the legislature did not state an express intent for MUTSA to apply to out-of-state conduct, as is required to overcome this presumption.  *See Longaker*, 872 F. Supp. 2d at 819 (citing *In re Pratt*, 219 Minn. 414, 18 N.W.2d 147, 153 (1945)).  Therefore, Bepex's MUTSA claim fails as a matter of law.

### 9.  Conclusion

HMBV very well could have misappropriated Bepex's trade secrets.  The Court's order is not to be read as a conclusion that HMBV did not.  The problem for Bepex, however, is that based on the record in this case, DTSA and MUTSA cannot reach HMBV's conduct as a matter of law, regardless of whether that conduct amounts to misappropriation.  Bepex tried every possible avenue to convince the Court otherwise, but none of the evidence to which Bepex points holds up under the scrutiny this Court must apply at the summary judgment

stage.  The Court **GRANTS** HMBV's Motion for Summary Judgment on the DTSA and MUTSA claims and dismisses those claims with prejudice because sufficient acts did not occur in the United States or Minnesota.  Therefore, the Court does not reach the issue of whether Bepex identified its trade secrets with particular specificity.

### C.  Breach of Contract

HMBV also seeks summary judgment on Bepex's breach-of-contract claims.  Bepex asserts that HMBV breached the 2016 License Agreement by continuing to "manufacture and sell equipment after the License Agreement's expiration."  [Compl. ¶ 21.]  For the contract claims, the parties do not dispute that HMBV used Bepex's proprietary information to sell Bepex-branded ▮▮▮▮ machines to ▮▮▮▮ and ▮▮▮▮ machines to ▮▮▮▮. Instead, they dispute whether these sales occurred within the timeframe covered by the 2016 License Agreement—which would mean no breach of contract—or whether they occurred after the agreement was terminated—which would mean the contract was breached.  In essence, because the equipment at issue takes so long to manufacture, the question presented to the Court is whether HMBV's sales should be counted at the time HMBV accepted the orders or delivered the equipment to its customers.

The 2016 License Agreement granted HMBV a license to use Bepex's "trademarks" and "technical information" to "make, use, have made, offer for sale and sell" the Solidaire, TorusDisc, and Turbulizer machines in certain specified countries.  [*See* 2016 License Agreement at 1–2, Schedule B, C].  It provided that HMBV could use the trademarks and technical information "only as permitted by this Agreement."  [*Id.* at 4.]  The contract defined "technical information" as "all identifiable know-how, experience, data and all other technical

or commercial information" relating to the three Bepex products. [*Id.* at 2.] "'Trademarks" is defined in the agreement as all "words, names, symbols, or devices or any combination thereof, adopted and used to identify" the listed Bepex products. [*Id.*]  Termination of the agreement "shall not bring to an end the confidentiality obligations of the parties" nor the "obligation to pay royalties for sales made prior to such termination." [*Id.* at 7.]  Bepex's argument is that HMBV breached the contract by making sales after the 2016 License Agreement expired using Bepex's confidential information.

Notably, however, the license agreement is silent on the question before the Court.  It does not define a "sale" or resolve whether a sale is counted at the time an order is received or delivered.  If a contract is unambiguous, its construction and effect present questions of law.  *Midwest Med. Sols., LLC v. Exactech U.S., Inc.*, 21 F.4th 1002, 1005 (8th Cir. 2021).  But if a contract's terms are ambiguous or incomplete, construction becomes a question of fact, unless "evidence of the parties' intent is conclusive." *Id.*  Language in a contract is ambiguous "if it is susceptible to two or more reasonable interpretations." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010) (citation omitted).  The threshold question of whether a contract is ambiguous is a legal question for courts to answer.  *Id.*

As a preliminary matter, the parties dispute whether their contract is subject to Minnesota's adoption of the Uniform Commercial Code.  If the contract is subject to the UCC, this could resolve the breach-of-contract claims as a matter of law because Minnesota law states that "[u]nless otherwise explicitly agreed" to by the parties," "title passes to the buyer at the time and place at which the seller completes . . . the physical delivery of the goods." Minn. Stat. § 336.2–401(2).  Bepex contends that because the parties did not explicitly agree

to a different arrangement, the UCC applies and HMBV's sales should be counted at the time of delivery, which occurred after the license agreement expired.

The UCC applies to the sale of "goods," which Minnesota law defines as "all things which are moveable at the time of identification to the contract for sale." Minn. Stat. §§ 336.2–102, 336.2–105(1). Though the contracts between HMBV *and its customers* concern physical goods, the same cannot be said about the contract between HMBV *and Bepex*—which is the operative contract the Court must analyze. The 2016 License Agreement grants HMBV a license to "utilize" Bepex's trademarks and technical information, which is defined as "all identifiable know-how, experience, data and all other technical or commercial information." But Bepex's "know-how" and "experience," however, are not moveable things. Another court in this district has previously found a similar royalty-bearing license agreement to be a contract for services, not goods. *See Am. Litho, Inc. v. Imation Corp.*, Civil No. 08-CV-5892 (JMR/SRN), 2010 U.S. Dist. LEXIS 15712, at *1 (D. Minn. Jan. 19, 2010) ("Any 'goods' contemplated in this agreement appear to be the goods that [plaintiff] hoped to manufacture through the use of [defendant's] patents—not 'goods' sold by [defendant] to [plaintiff]."). Here, the 2016 License Agreement gave HMBV a license to sell Bepex-branded equipment to customers in exchange for royalty payments; the agreement did not concern the sale of goods from HMBV to Bepex. For the same reason described in *American Litho Inc.*, the UCC does not apply to the license agreement between HMBV and Bepex and does not resolve, as a matter of law, when HMBV's sales to ▮▮▮▮ and ▮▮▮▮ should be counted under the contract.

Both parties rely on various terms within the contract to bolster their interpretation of when a sale should be counted. HMBV cites the section of the license agreement governing

termination, which states that termination of the agreement "shall not bring to an end . . . the obligation to pay royalties *for sales made prior to termination*." [2016 License Agreement ¶ 8.3 (emphasis added).]   HMBV reasons this term shows that the parties intended to allow HMBV to finish projects it received and started before the agreement was terminated.  Bepex responds by pointing to the section of the agreement governing royalty payments, which requires such payments to be paid within thirty calendar days of the "end of each calendar quarter."  [*Id.* at ¶ 5.2.4.]  Bepex contends that the provision regarding royalty payments "for sales made prior to termination" simply means that HMBV could still be on the hook for royalty payments in the quarter immediately following the termination of the agreement. [Bepex Opp'n 37 n.11.]

HMBV also points to various terms within the contract that distinguish between the act of selling and the act of delivering equipment to support its position that a sale should be counted at the time an order is accepted.  [*See, e.g.*, 2016 License Agreement at ¶ 2.3 ("for the *sale and delivery* of such Product"); *id.* at ¶ 3.1 ("for all Products *sold or supplied* by the Licensee"); *id.* at ¶ 10.3 "the *sale, distribution and advertising* of goods") (emphasis added throughout).]  HMBV contends that "sale" and "delivery" must have different meanings because each contractual provision "should be read consistently with the others" and "terms must be construed" so that none of them are rendered meaningless.  *Jacobs*, 933 F.2d at 657.

The Court finds the readings put forth by each side to have merit as to when a sale should be counted under the contract.  But neither reading is a slam dunk.  No explicit contract language plainly and completely illustrates the parties' intent as to when a sale is counted, and terms that can potentially bear upon that issue reasonably suggest more than one possible

outcome.  For example, the separate use of the terms "sale" and "delivery" reasonably evokes the parties' intent that the point at which an order is accepted is when a sale occurs for purposes of the dispute in this case.  On the other hand, one can just as reasonably point to the contract's royalty-payment provisions and discern that the parties contemplated a sale would be counted only when the sale was ultimately completed through delivery of the product.  The contract is "susceptible to two or more reasonable interpretations." *Dykes*, 781 N.W.2d at 582.  Therefore, the construction of when a sale should be counted is a question of fact.  *See Jacobs*, 933 F.2d at 657.

Bepex and HMBV also both rely on course-of-conduct evidence to support their interpretations, and the conflicting course-of-conduct evidence results in a dispute about material facts that preclude the Court from granting summary judgment.  HMBV cites an email exchange in 2013 near the expiration of the previous license agreement.  In this exchange, HMBV asked Bepex for calculation assistance regarding a part on a Solidaire machine.  [Dkt. No. 284 at 4.]  Bepex responded that the license agreement was set to expire the next day.  [*Id.* at 3.]  HMBV replied that the order had "already started, therefore within the contract and Bepex will receive license fee." [*Id.* at 2.]  The HMBV employee sending the email then asked, "Or am I totally wrong with my understanding?" [*Id.*]  A Bepex director responded that Bepex was "not aware that this was a project you had under fabrication," apologized "for the misunderstanding," and requested further information from HMBV so that Bepex "may address your questions." [*Id.* at 2.]

Two weeks later, Bepex indicated that it was going to terminate the license agreement. [Dkt. No. 285.]  In this correspondence, Bepex noted that the license agreement did "not

include a post-cancellation grace period for open projects" but Bepex "understand[s] that HMBV has put time and effort into projects" that were started, instructed HMBV to send it a list of those projects, and stated that Bepex would offer HMBV "exclusivity for those orders." [*Id.*] HMBV contends that these exchanges show a course of dealing by which the parties allowed projects to be completed that had started while the license agreement was still in effect, even if the finished product would be delivered after that agreement expired. But especially when taking the inferences in Bepex's favor, a reasonable juror could also conclude from this evidence that the parties considered sales to be complete at delivery, because of Bepex's acknowledgement that the contract does not "include a post-cancellation grace period for open projects." Bepex points to other course-of-dealing evidence, namely that although the contract specified that HMBV should pay royalties on a quarterly basis, HMBV didn't pay Bepex royalties until after it had delivered equipment. According to Bepex, this delay in royalty payments demonstrates that the parties understood that sales weren't completed until the equipment was delivered. [Bepex Opp'n 37.] This evidence too helps create a triable issue on Bepex's breach-of-contract claims.

Aside from course-of-dealing evidence, the parties also dispute the timeline of the sales and the operative effect of the various sales documents between HMBV and its customers. Regarding the ███████ sale, HMBV contends that it entered into a binding sales contract with ██████ on December 14, 2018, and it "invested time, effort and engineering hours" before the September 2, 2019 termination date of the 2016 License Agreement. [HMBV Mem. Summ. J. 32 (citing Christophe Krug Decl. 3–4, Dkt. No. 147); *see also* ██████ Sales Agreement.] Bepex responds that the document ██████ first signed specifically states that

it "is NOT a commitment to proceed with the full order," and that HMBV did not enter the final order with ██████ until April 2019, after it received the formal notice of termination. [Bepex Opp'n at 35 (citing ██████ Purchase Order).]    Bepex adds that HMBV "curiously . . . failed to disclose" the April 2019 final order date in its sales chart.   [Bepex Opp'n 35, citing HMBV Sales Chart.]  However, Bepex cites the December 18, 2018 purchase order, not the December 14, 2018 sales agreement that HMBV referenced.  [*Compare* ██████ Purchase Order, Dkt. No. 331-1 *with* ██████ Sales Agreement, Dkt. No. 295.]  Bepex also emphasizes that HMBV did not deliver the equipment until October 2020, over a year after the license agreement expired in September 2019.  [HMBV Sales Chart, Dkt. No. 327-20.]

As for the ██████ transaction, the two purchase orders are dated December 6, 2018.  ██████ Purchase Orders.]  HMBV's Managing Director testified that the purchase orders were signed and accepted on December 13, 2018, and engineering on these projects began in January 2018 and January 2019.  [Christophe Krug Decl. 3–4.]  But Bepex contends that HMBV did not "undertake significant design efforts" on the ██████ order until June 2019 and emphasizes that HMBV did not deliver the equipment until February 2020, five months after the license agreement expired.  [Bepex Opp'n 36.]

The meaningful factual disputes surrounding the parties' course of conduct, the timeline of the sales, and the operative sales documents highlight why summary judgment is not suitable, as extrinsic evidence may answer the question presented by the ambiguous contract language, and resolution of the contractual claims is best suited for the ultimate factfinder.  HMBV's motion for summary judgment is **DENIED** as to the breach-of-contract

claims because genuine disputes of material fact preclude awarding HMBV judgment as a matter of law.[3]

### D. Money Damages

In addition to seeking summary judgment on each of Bepex's claims, HMBV also seeks summary judgment on certain forms of relief sought by Bepex.  [*See* HMBV Mem. Summ. J. 36–43, 44–46.]  HMBV asserts that Bepex is not entitled to exemplary damages or reasonable attorneys' fees because the alleged misappropriation was not willful and malicious.  It also contends that Bepex's lost profits theory is untimely and speculative and that the unjust enrichment theory is conjectural as well.

DTSA and MUTSA authorize the award of exemplary damages and attorneys' fees, and Bepex exclusively sought these damages pursuant to those statutes.  *See* 18 U.S.C. § 1836(b)(3)(B)–(D); Minn. Stat. § 325C.03; Compl. 13 (requesting exemplary damages and attorneys' fees pursuant to DTSA and MUTSA).  Because the Court has dismissed Bepex's DTSA and MUTSA claims, it need not wade into the parties' disputes concerning the relief those laws provide.  For similar reasons, it need not wade into the parties' disputes concerning

---

[3] The Court's decision that the contract claims need to be tried to a jury would be the same regardless of whether these claims were construed to encompass all three sales.  It is unclear from the complaint and summary judgment briefing whether Bepex's breach-of-contract claim is limited to the two sales that were initiated before the license agreement expired (*i.e.*, the sales to ███████ and ████████), or whether the claim also encompasses the sale of the allegedly independently designed machine to ████████, which all parties agree occurred after the license expired.  To the extent Bepex's breach-of-contract claim was intended to include the ████████ o sale and HMBV seeks summary judgment on it, the motion is denied without prejudice with respect to that sale due to a lack of briefing on the pertinent issues.  *See United States v. Sineng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that in "our adversarial system of adjudication . . . we rely on the parties to frame the issues for decision" and reversing because the lower court had departed from the party presentation principle).

the unjust enrichment damages, which are also specifically authorized by DTSA and MUTSA for trade secret misappropriation.  *See* 18 U.S.C. § 1836(b)(3)(B)–(D); Minn. Stat. § 325C.03.[4]

All that remains is HMBV's challenge to Bepex's lost profits theory, which remains relevant to the surviving breach-of-contract claims.  HMBV contends that the lost profit theory is untimely and that Bepex could not have made the sales in question, therefore failing to establish the requisite but-for causation to support this theory of damages.

HMBV already presented the timeliness argument in its First Motion to Strike.  Judge Docherty considered and rejected this argument in his Order on HMBV's First Motion to Strike, finding that Bepex's disclosure of its lost profits theory was timely, and that even if it was untimely, the disclosure was substantially justified and harmless.  [*See* Order on First Mot. to Strike 17–19, Dkt. No. 368.]  HMBV has not objected to this part of Judge Docherty's Order, and this Court is unable to find any error, clear or otherwise, in this conclusion.  Accordingly, this Court does not consider anew whether Bepex's lost profits theory is untimely.  *See* 28 U.S.C. § 636(b)(1) (limiting de novo review to portions of orders to which specific objections are made).

---

[4] Bepex did not include the unjust enrichment theory of damages in its complaint.  As a result, it cannot be discerned from the pleadings if Bepex is seeking unjust enrichment damages for just its trade secret claims or also for its breach-of-contract claims.  However, the deposition of Bepex CEO Greg Kimball makes clear that Bepex's unjust enrichment theory of damages is limited to the trade secret misappropriation claims.  [*See* Dkt. No. 363 at 5 (agreeing that "Bepex claims that HMBV saved at least $5.5 million by not having to develop *alleged trade secrets* that correspond to Bepex's" and stating that the $5.5 in unjust enrichment damages does "not include the multiplier" that DTSA or MUTSA authorize for willful infringement of trade secrets) (emphasis added)].

HMBV's arguments regarding whether Bepex could have made the sales to ███ and ███ create genuine factual disputes this Court cannot resolve on a motion for summary judgment. *See Cargill, Inc. v. Ron Burge Trucking, Inc.*, Civ. No. 11-2394 (PAM/JJK), 2013 WL 608520, at *2 (D. Minn. Feb. 19, 2013) (denying summary judgment on breach of contract claim due to questions of fact regarding causation); *see also Jerry's Enter., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 815 (Minn. 2006) (holding that questions of fact concerning but-for causation precluded judgment). For instance, HMBV argues that competitors like Andritz, Vomm, Haarslev, Nara, Lödige and Scott make or sell similar equipment to Bepex and could have made the sales instead of Bepex. Bepex responds by pointing to evidence that ███ has returned to Bepex to buy equipment after HMBV suspended sales during this litigation. There is a genuine evidentiary dispute regarding whether Bepex could have made the sales to ███ and ███ if HMBV had not done so. The Court cannot determine that Bepex is precluded, as a matter of law, from seeking damages under a lost profits theory. HMBV's Motion for Summary Judgment as to money damages is **DENIED.**

## III.   MOTIONS TO STRIKE

As with other aspects of this case, discovery has been protracted and contentious. In addition to ruling on HMBV's Motion for Summary Judgment, this Court addresses Bepex's Objections to Judge Docherty's Order regarding HMBV's First Motion to Strike, as well as HMBV's Second Motion to Strike, because the underlying issues are interrelated.

### A. First Motion to Strike

HMBV filed its First Motion to Strike in May 2022, seeking to strike as untimely Bepex's Third Supplemental Answers to HMBV's Interrogatories. [Dkt. No. 215.] Judge Docherty denied the motion in large part. He found that Bepex's disclosures regarding the identification of trade secrets, the circumstances of their transfer, and a new lost profits damages theory were timely, but precluded Bepex from "relying on its untimely disclosure of Mr. [Tom] Brion as an expert witness at trial" because the late disclosure was not substantially justified or harmless. [Order on First Mot. to Strike, Dkt. No. 368.] Bepex appeals this part of the order. Bepex filed a letter to Judge Docherty seeking leave to file a motion for reconsideration and also filed Objections to his Order. [*See* Letter, Dkt. No. 369; Objections, Dkt. No. 375.] Judge Docherty denied the request for reconsideration. [Order Denying Leave, Dkt. No. 391.]

Bepex makes substantially the same arguments in the Objections now before this Court. First, Bepex argues that Mr. Brion's disclosure was not a late expert disclosure because Bepex does not intend to use him as an expert. Second, Bepex argues that factual circumstances have changed since HMBV filed the First Motion to Strike because HMBV took Mr. Brion's deposition, thus eliminating any prejudice to HMBV from the late disclosure. Neither argument convinces this Court that Judge Docherty committed error, clear or otherwise, in his Order.

The Court's review of a magistrate judge's order on a nondispositive motion is "extremely deferential." *Scott v. United States*, 552 F. Supp. 2d 917, 919 (D. Minn. 2008). Such an order should be overruled only where it is "clearly erroneous or contrary to law." Fed. R.

Civ. P. 72(a); D. Minn. LR 72.2(a)(3).  "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  A decision is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Wells Fargo & Co. v. United States*, 750 F. Supp. 2d 1049, 1050 (D. Minn. 2010) (cleaned up).  This means that a district court should not reverse a magistrate judge's nondispositive decision unless it is implausible "in light of the record viewed in its entirety," even if the reviewing court might have decided it differently in the first instance. *Shank v. Carleton Coll.*, 329 F.R.D. 610, 613 (D. Minn. 2019).  Having thoroughly reviewed the record and the parties' arguments, the Court concludes that Judge Docherty's Order was neither clearly erroneous, nor contrary to law.  The record reveals that he made an appropriate exercise of discretion in ruling on HMBV's First Motion to Strike.

This Court rejects Bepex's first argument for the same reason provided by Judge Docherty in denying leave to file a motion to reconsider.  The initial order held only that Bepex could not use Mr. Brion as an *expert* witness; it took no position as to what kind of witness Mr. Brion could be or whether his disclosure as a fact witness was untimely.  [*See* Order Denying Leave, Dkt. No. 391.]  Bepex's contention that it does not plan to use Mr. Brion as an expert witness fails to convince this Court that Judge Docherty committed clear error in holding that Bepex was precluded from doing so.  Whether or not Bepex plans to use Mr. Brion as an expert witness does not change the fact that its disclosure of him occurred after the deadline for identifying expert witnesses.  Judge Docherty did not err in reaching this

holding, and Bepex points to no "statutes, case law or rule[] of procedure" that he misconstrued. *Wells Fargo*, 750 F. Supp. 2d at 1050.

Bepex's second argument supporting its request to reverse Judge Docherty's Order fares no better. Bepex contends that any prejudice to HMBV from the late disclosure was cured by HMBV taking Mr. Brion's deposition in June 2022. This Court fails to see how an intervening factual development renders Judge Docherty's Order "clearly erroneous" or "contrary to law," but in any event, Mr. Brion's deposition certainly fails to meet that high bar. Bepex designated Mr. Brion as a corporate representative under Federal Rule of Civil Procedure 30(b)(6), which allowed him to testify on behalf of the corporation on certain, agreed-upon topics. *See* Fed. R. Civ. P. 30(b)(6). Mr. Brion's designation as a Rule 30(b)(6) corporate designee and his corresponding testimony on circumscribed topics does not amount to HMBV taking his deposition as an expert witness. *See, e.g., List v. Carwell*, Case No. 18-cv-2253 (DSD/TNL), 2020 U.S. Dist. LEXIS 187986, at *37 (D. Minn. Oct. 8, 2020) ("The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents."); *see also Pax Water Techs., Inc. v. Medora Corp.*, No. CV 18-9143-JAK (AGRx), 2019 WL 12381114, at *3 (C.D. Cal. Oct. 15, 2019) ("An expert deposition is not the equivalent of a Rule 30(b)(6) deposition."). Having Mr. Brion sit as Bepex's corporate representative to testify about matters *known to Bepex* is not equivalent to deposing him on his opinions as an expert.

The substance of Mr. Brion's deposition confirms this. From the start of the deposition, the parties agreed that Mr. Brion was "designated by Bepex" to testify about Bepex's knowledge "concerning Topics 18 and 20." [Tom Brion Dep., Dkt. No. 267]. Topic

18 concerns "how, why, and by what measure Plaintiff's alleged trade secrets derive independent economic value" and Topic 20 concerns how HMBV "misappropriated Plaintiff's alleged trade secrets." [*Id.*] The deposition of Mr. Brion was limited to these two topics, and "information known or reasonably available" to Bepex about these topics, *see* Fed. R. Civ. P. 30(b)(2); it did not reach matters contemplated by Federal Rule of Evidence 702. For all of these reasons, this Court affirms Judge Docherty's Order dated September 19, 2022 and overrules Bepex's Objections to that Order.

### B. Second Motion to Strike

HMBV filed a second motion to strike, this time asking this Court to strike exhibits filed in support of and arguments made within Bepex's opposition brief to HMBV's Motion for Summary Judgment. [Dkt. No. 339.] More specifically, HMBV moved for an order striking identifications of trade secrets that allegedly were first identified in Bepex's opposition brief; Exhibit 5 to Tom Brion's Declaration filed in support of the opposition brief; Exhibit 55 to Jeffrey Post's Declaration in support of the opposition briefp; and references in the opposition brief to "non-produced documents relevant to [Bepex's] unjust enrichment" theory of damages. [HMBV Mem. Second Mot. to Strike 1, Dkt. No. 341.]

This Court need not decide whether this motion is procedurally improper, as Bepex suggests, because the material HMBV seeks to strike in its second motion concerns the trade secret misappropriation claims the Court has concluded are not viable for reasons independent of the materials at issue. Specifically, HMBV seeks to strike allegedly new identifications of trade secrets; Exhibit 5 to Tom Brion's Declaration, which concerns one of Bepex's claimed trade secrets relating to the ███████ sale; and information relevant to Bepex's unjust

enrichment theory for damages, which stems from the misappropriation claims.  Therefore, this Court denies this nondispositive motion as moot.  The information HMBV wants this Court to strike is no longer relevant to the remaining claim, so this Court need not expend the resources in determining whether to strike it.

## IV.   ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that**:**

1. HMBV's Motion for Summary Judgment [Dkt. No. 261] is **GRANTED IN PART** and **DENIED IN PART.**  The motion is granted with respect to the claims for trade secret misappropriation under DTSA and MUTSA and denied with respect to the breach of contract claims.

2. HMBV's Second Motion to Strike [Dkt. No. 339] is **DENIED as moot.**

3. Bepex's Objections to Judge Docherty's Order on HMBV's First Motion to Strike [Dkt. No. 375] are **OVERRULED** and Judge Docherty's Order [Dkt. No. 368] is **AFFIRMED.**


Date: March 29, 2023

_s/Katherine Menendez_
Katherine Menendez
United States District Judge